IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 CR 52 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| KENOSHA FULLILOVE | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On September 17, 2010 Defendant Kenosha Fullilove ("Fullilove") was convicted by a jury of one count of conspiracy to commit bank robbery (Count I), one count of aiding and abetting a bank robbery (Count II) and one count of aiding and abetting use of a firearm during the commission of a bank robbery (Count III), in violation of 18 U.S.C. §§ 371, 2113(a) and 924(c)(1) respectively. She now brings a motion for judgment of acquittal or new trial under Federal Rules of Criminal Procedure 29 and 33 (Docs. 65 and 83), asserting that: (1) there was insufficient evidence to convict her on all three counts; (2) the Court erred in admitting her statements about traveling to Minnesota after being contacted by law enforcement about the robbery; (3) the Government presented testimony from a now-suspected bank robber; and (4) the prosecutor made a comment alluding to Fullilove's decision not to testify in his closing argument. For the below reasons, the Court denies Fullilove's motion.

**I.  BACKGROUND AND TRIAL.**

On November 24, 2006, Nickolas Lee robbed the Chase bank branch located at 850 South Wabash Street in Chicago at gunpoint, making off with $109,000. The Government indicted

Fullilove, formerly employed by that Chase branch, as a conspirator in that crime. Before Fullilove's trial in September 2010, Lee and Caroline Rivera, another employee of the branch, were convicted in connection with the robbery. At trial, in addition to other witnesses, the Government presented the testimony of Lee and Rivera, who testified regarding planning meetings that Lee, Rivera and Fullilove held in advance of the robbery, and that according to Lee, Fullilove received $10,000 in proceeds from the robbery from Lee. The Government also presented testimony of FBI Agent Matthew Alcoke, who testified that he interviewed Fullilove in June 2007 about the robbery. Agent Alcoke testified that during that pre-arrest meeting, he showed Fullilove an arrest a warrant had been issued to Lee for the Chase robbery, as well as a picture of Rivera. Agent Alcoke also testified regarding a second meeting with Fullilove after she was arrested in connection with the robbery. According to Agent Alcoke, at that post-arrest meeting, Fullilove admitted she had arranged the initial meeting involving herself, Rivera and Lee, to discuss the robbery, that the meeting concerned the bank's security procedures, and that she was "80 percent sure" a gun was discussed during that meeting. Agent Alcoke also testified that Fullilove told him that right before the robbery, she saw Lee, and Fullilove told Agent Alcove that she thought Lee had a gun. The jury convicted Fullilove on all three counts.

## II.   STANDARD OF REVIEW.

### A.   Motion for Judgment of Acquittal.

A motion for judgment of acquittal under Rule 29 challenges the sufficiency of the evidence against a defendant. *See* Fed. R. Crim. P. 29 (requiring the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction"). In challenging the sufficiency of the evidence, Fullilove "bears a heavy, indeed, nearly insurmountable, burden."

2

*United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). Such a motion should be denied if, after viewing the evidence in the light most favorable to the Government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004); *see also United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (citing *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999) and finding a conviction entered after trial by jury should not be overturned unless "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.")

  **B. Motion for New Trial.**

A motion for a new trial under Rule 33(a) should be granted only if required "by the interest of justice." Fed. R. Crim. P. 33(a). Such motions should be granted sparingly and are only appropriate if "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). A defendant is entitled to a new trial only if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *See United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996).

**III. DISCUSSION.**

  **A. There Was Sufficient Evidence to Convict Fullilove on All Three Counts.**

    1. <u>Counts I and II (Conspiracy to Commit Bank Robbery and Bank Robbery)</u>

Fullilove asserts that the Court should reverse the jury's verdict because the Government presented insufficient evidence to convict Fullilove of conspiracy to commit bank robbery (Count I) and bank robbery (Count II), arguing that the "testimony did not establish that . . . Fullilove agreed" with Rivera and Lee to commit the robbery. (Mot. at 2.) Fullilove further asserts that there was no evidence that she "advised, counseled or instructed anyone to use force, violence or

3

intimidation to commit the robbery." (*Id.*) To prove conspiracy the Government must establish "that there was agreement between two or more persons to commit an unlawful act, that a defendant was party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the coconspirators." *United States v. Jones*, 950 F.2d 1309, 1313 (7th Cir. 1991); 18 U.S.C. § 371. "In meeting its burden, 'the government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship between the parties, their overt acts, and the totality of their conduct may serve as proof.'" *Jones*, 950 F.2d at 1313 (internal citations omitted). To show Fullilove committed bank robbery under an aiding and abetting theory, the Government must show the elements of bank robbery, (1) the principal (Lee) took money belonging to the bank, (2) that the bank was federally insured, and (3) that the principal acted to take the money by force, violence or intimidation, as well as the "knowledge of the crime, intent to further the crime, and some act of help" by Fullilove. *See* 18 U.S.C. §§ 2, 2113; *United States v. Carter*, 410 F.3d 942, 952 (7th Cir. 2005); *United States v. Woods*, 148 F.3d 843, 846 (7th Cir. 1998).

The evidence presented by the Government—in particular the testimony of her co-conspirators and her own statements—was more than sufficient for a reasonable jury to convict Fullilove of conspiracy and aiding and abetting the bank robbery. Lee testified that:

1. Fullilove spoke to him about how the ease of robbing the Chase branch where she used to work, knowing he had previously robbed banks. (Tr. 387-90);

2. Fullilove then called Rivera, introduced Lee to Rivera, the three had a planning meeting. (Tr. 393-400.) At that meeting, Fullilove told Rivera that Fullilove and Lee wanted to rob the Chase branch where Rivera worked. (Tr. 395.) Fullilove asked Rivera about specific bank procedures, including requiring two separate codes to access the vault, and the three planned the date and time of the robbery. (Tr. 397-400.)

4

3.  On the morning of the Fullilove called Lee to ensure he was up, met him at her boyfriend's apartment, and drove him to the car to be used in the robbery (Tr. 402-03.) At that point, Fullilove and Lee agreed to meet after the robbery in her apartment. (Tr. 403.)

4.  Lee robbed the bank at gunpoint, met Fullilove at her apartment, and gave her $10,000. (Tr. 404-06.) At that exchange, Fullilove told Lee not to give Rivera any money from the robbery because she did not show up at work the day of the robbery and participate as planned. (Tr. 406.)

Rivera confirmed Lee's testimony regarding the planning meeting in many respects, testifying that:

1.  Two days before the robbery, Fullilove called Rivera to meet up. (Tr. 309-10.) That day, Rivera met with Fullilove and Lee, and Fullilove talked about her need for money and introduced Lee as friend who "robs banks for a living." (Tr. 313.) During that meeting, the three discussed the bank's security procedures. (Tr. 313-16.) Rivera stated that Fullilove did most of the talking at this meeting. (Tr. 312.)

2.  During the planning meeting, Fullilove asked Rivera to play an "innocent" victim role and enter one of the two codes to enter the vault for Lee. (Tr. 316.) Fullilove told Rivera that if she did not go through with the plan, she Rivera would be "just as guilty" as Fullilove and Lee. (Tr. 320.) Rivera agreed to participate with Fullilove and Lee in robbing the bank (Tr. 320.)

3.  From this meeting, Rivera had the understanding that Lee would use a gun in the robbery. (Tr. 318-19.)

4.  Though Rivera ended up not going to work the day of the robbery and did not receive any proceeds from it, Fullilove threatened that if Rivera talked about the robbery, there would be "problems" and it would be "bad" for both Rivera and Fullilove. (Tr. 329-31).

Finally, Agent Alcoke corroborated both Lee and Rivera's testimony by testifying as to Fullilove's own statements in her post-arrest interview, specifically that:

1.  Fullilove participated in the robbery because she needed money, and identified Lee as the person she met who robbed banks. (Tr. 511, 513, 543.)

2.  Fullilove arranged the planning meeting with Lee and Rivera, introducing Lee as a bank robber to Rivera. (Tr. 515.) At that meeting, Fullilove, Lee and Rivera discussed the bank's security procedures, including that the vault

5

> required two codes, called "A" and "B" codes. (*Id.*) Further, the three reached an understanding that Rivera would play a victim and help Lee open the vault by punching in her half of the code. (Tr. 515-16.)
>
> 3. Fullilove was not sure who brought up the topic of using a gun during the planning meeting but she was "80 percent sure" a gun was discussed (Tr. 518.) On the morning of the robbery, when she arrived at her boyfriend's apartment, Lee told her that he was about to rob the bank. (Tr. 519.) When Agent Alcoke asked if she saw Lee with a gun that morning, Fullilove said, "I think so, yeah." (*Id.*)

Fullilove's two assertions in her motion, (1) that the testimony did not show she agreed with Lee and Rivera to rob the bank, and (2) that, at most, "Fullilove understood that the robbery was an inside job" and that "no force, violence or intimidation would be necessary" (Mot. at 2), are at odds with the evidence listed above, especially when reviewed in the light most favorable to the Government. As to agreement, a reasonable jury could conclude that Fullilove, Lee and Rivera agreed to rob the bank when Fullilove told Rivera at the planning meeting that Fullilove and Lee wanted to rob the Chase bank. At that meeting, the three worked out specific details of the crime, including time, date and how to enter two separate vault codes. Fullilove did not stop there, however. She drove Lee to his car the morning of the robbery, and they discussed meeting after to divvy up the proceeds. There is more than enough evidence for a rational jury to conclude Fullilove agreed with Lee, and that Fullilove agreed with Lee and Rivera, to rob the Chase branch.

As to Fullilove's belief as to whether force, violence or intimidation would be necessary, it is true that Lee and Rivera testified that the plan involved Rivera, playing an "innocent" employee, entering one of the two codes required to open the vault. But the insider only got Lee halfway there. A rational jury could find that some sort of force, violence or intimidation would be required to convince another bank employee to enter the other code. Further, Fullilove told Agent Alcoke that she was "80 percent sure" a gun was discussed at the planning meeting. That is consistent with

6

Rivera's testimony. She stated that she understood from the planning meeting—the only meeting she had with Fullilove and Lee before the robbery—that a gun would be used. Agent Alcoke asked Fullilove after her arrest whether she saw Lee with a gun the morning of the robbery; she replied, "I think so, yeah" This is enough for a rational jury could to conclude that Fullilove knew that force, violence or intimidation would be used in the robbery.

2. Count III (Aiding and Abetting Use of a Firearm in Bank Robbery).

According to Fullilove, the jury also had insufficient evidence to convict her on Count III, aiding and abetting the use of a firearm in a violent bank robbery, in violation of 18 U.S.C. § 924(c). To demonstrate a violation of § 924(c) under an aiding and abetting theory, the Government must show beyond a reasonable doubt that Fullilove "knowingly and intentionally assisted the principal's use or possession of a firearm during a violent felony." *United States v. Daniels*, 370 F.3d 689, 691 (7th Cir. 2004). The jury must find "(1) the defendant knew, either before or during the crime, of the principal's weapon possession or use; and (2) the defendant intentionally facilitated that weapon possession or use once so informed." *United States v. Andrews*, 442 F.3d 996, 1002 (7th Cir. 2006). As Fullilove points out, "merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction under . . . § 924(c)." *Id.* "Once knowledge on the part of the aider and abettor is established, it does not take much to satisfy the facilitation element." *Woods*, 148 F.3d at 848 (listing examples of facilitation by an aider and abettor, including driving the principal and gun to the crime, encouraging others to use a gun, and "benefitting from the use of the gun"); *see also Daniels*, 370 F.3d at 691 (confirming *Woods* found that "benefitting from the use of a gun" was sufficient to satisfy the facilitation prong of the test for aiding and abetting under §

7

924(c)). Fullilove challenges the sufficiency of the evidence on both the knowledge and the facilitation elements.

Turning first to Fullilove's knowledge of the gun, Agent Alcoke testified that Fullilove told him after she was arrested that, on the morning of the robbery, Lee told her he was going to rob the bank, and when Agent Alcoke asked if Lee had a gun, she relied "I think so, yeah." Further, she told Agent Alcoke that at the planning meeting with Lee and Rivera before the robbery, she was "80 percent sure" a gun was discussed. Rivera testified that she understood from the planning meeting that Lee would bring the "tools" necessary to rob the bank, and she left that meeting with the impression that a gun would be used. (Tr. 318-19.) From this testimony, it was reasonable for the jury to conclude that Fullilove knew, before the robbery, that Lee was going to use a gun.

As for the second prong, looking at the evidence in the light most favorable to the Government, a rational jury could have found that Fullilove facilitated the use of the gun in two different ways. First, Lee testified that just 20 or 30 minutes before the robbery at 8:00 a.m., Fullilove picked him up from Fullilove's boyfriend's apartment and drove Lee to his car. (Tr. 402-03, 408.) From there, Lee headed straight to the Chase branch to rob it. (Tr. 403.) Lee further testified that he had his gun right before the robbery. (Tr. 404.) Agent Alcoke testified that Fullilove told him that she thought that Lee had a gun the morning of the robbery. Lee testified the robbery had been planned with Fullilove to occur when the bank opened at 8 a.m. (Tr. 400-01.) From this testimony, a reasonable jury could conclude that Fullilove facilitated the use of the gun by providing transportation for Lee and the gun, helping Lee get to the bank at the appointed time. *See Woods*, 148 F.3d at 848. Second, a rational jury could have found that Fullilove benefitted from the use of the gun from Lee's testimony that he gave her $10,000 of the proceeds from the robbery.

8

(Tr. 406.) Lee testified he went for the vault instead of the teller drawers because, in his bank robbery experience, the vault had more money. (Tr. 404.) The jury could find that without threatening bank employees with the gun, Lee would not have been able to force those employees to open the vault so that Lee could steal the money Fullilove received, or that Fullilove would have received a smaller amount if Lee robbed the bank without a gun. *See United States v. Moore*, 572 F.3d 334, 342 (7th Cir. 2009) (finding using a gun made the robbery quicker and allowed more money to be stolen); *Woods*, 148 F.3d at 848 (holding "the use of the gun in the bank expedited [the principal's] looting of the teller's cash drawer," allowing the robbery to happen quicker for the benefit of the getaway driver); *United States v. Taylor*, 226 F.3d 593, 597 (7th Cir. 2000) (noting that facilitation had been found in another case where the defendant had collected money from the teller drawers after the principal had threatened bank employees with a gun and citing *United States v. Price*, 76 F.3d 526, 530 (3d Cir. 1996)). Fullilove has not met her high burden of showing no rational jury could find her guilty of violating § 924(c).

### B. The Court Did Not Err In Admitting Testimony Regarding Fullilove's Whereabouts After the Robbery.

Next, Fullilove asserts that the Court should not have allowed Agent Alcoke to testify that Fullilove told him that she went to Minnesota after she was first interviewed by the FBI regarding the robbery because she was "afraid of what might happen." (Mot. at 3.) The parties briefed the issue during trial prior to Agent Alcoke's testimony (Docs. 51, 52) and the Court admitted this testimony as a statement against interest. The Court found it was a reasonable inference "that when you are being interviewed by law enforcement regarding a potential bank robbery and your statement is that, I am leaving under fear of what might happen, one reasonable inference is it is because of criminal prosecution . . . ." (Tr. 445.)

After the Court admitted the testimony, Agent Alcoke testified:

Q. In the course of the conversation that you had with her, did you ask her about where she had been since your initial interview of her in June of 2007, this being January 27th of 2009?

**A. I did. And --**

Q. What does --

**A. Excuse me.**

Q. What did she specifically say to you at that time?

**A. The defendant told me that after I confronted her in June of 2007 with knowledge that she had a role in planning a bank robbery and executing a bank robbery that she left Chicago and went to Minnesota.**

Q. Did she provide any reasoning why she left Chicago and went to Minnesota?

**A. Yes. She was afraid of what was --**

MR. FRANKEL: Objection.

THE COURT: Overruled.

BY MR. MAY:
Q. Go ahead.

**A. I'm sorry. Yes, she told me -- the defendant told me that she was afraid of what was coming.**

(Tr. 519-20.) Fullilove asserts that this testimony was more prejudicial than probative under Federal Rule of Evidence 403. (Mot at 3.)

The test for whether "flight evidence is probative as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning

the crime charge to actual guilt of the crime charged." *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005). Here, all four inferences can be drawn with sufficient confidence.

Fullilove herself drew the inference that her move to Minnesota after the June 2007 meeting was flight, by telling Agent Alcoke she left Chicago after being "confronted," regarding the robbery, and not for any innocuous reason, like a job change or to be closer to family. The next three inferences can be drawn from her knowledge at the time of flight. From the interview on June 15, 2007 with Agent Alcoke, Fullilove knew that an arrest warrant had been issued for Lee in connection with the Chase branch robbery on November 24, 2006, and that the Government suspected Rivera played a role (Agent Alcoke showed a Rivera's picture to Fullilove). At the time she left for Minnesota, she knew exactly what crime was being investigated and that the Government was probing her involvement and knowledge. This is not an instance where she fled without any knowledge of why the Government was talking to her. *See e.g., United States v. Jackson*, 572 F.2d 636, 640 (7th Cir. 1978) (finding the third inference was weak because a period of time had passed since the crime and there was no evidence that the defendant knew why federal agents were coming to arrest him). Nor does the delay between the actual crime and the flight it weaken the inference that Fullilove fled out of fear of prosecution because the move occurred directly after—and in Fullilove's words, as a direct result of—learning of the prosecution of her co-conspirators. *See United States v. Levine*, 5 F.3d 1100, 1108 (7th Cir. 1993) (rejecting the defendant's argument that the year that passed between the crime and flight negated the inference because the defendant "had no reason to flee until he realized that he might face criminal sanction . . .").

Fullilove asserts that she fled because "[s]he probably was afraid of Nickolas Lee, who was a serial bank robber with a long criminal history." (Mot. at 4.) Indeed, the Court, when explaining

11

why the statement would be admitted, recognized that very inference could be drawn. (Tr. 445 ("I think you're both free to argue . . . [flight out of fear of prosecution] is not the reasonable inference, that yours is because of fear of these individuals . . . .")) But when considering the question of whether the evidence of flight is probative, the issue of competing inferences is beside the point. Just because there is another possible inference for the move to Minnesota does not mean that the evidence of flight is inadmissible. *See United States v. Lewis*, 797 F.2d 358, 368 (7th Cir. 1986) (holding "[t]hat other interpretations are conceivable, so that flight is not conclusive on the question of guilt, does not mean that the evidence is irrelevant" because such a rule "would foreclose the admission of this type of evidence in any prosecution").

Further, even if the evidence was more prejudicial than probative, its admission would not entitle Fullilove to a new trial because there was plenty of evidence to demonstrate Fullilove conspired to commit the robbery and aided and abetted it. *See Skoczen*, 405 F.3d at 548-49 (noting that although flight cannot be the Government's only evidence, any prejudice was harmless because the prosecution presented statements by the defendant as well as his co-conspirators). As detailed above, the jury heard ample and consistent testimony from both of Fullilove's co-conspirators, as well as from Agent Alcoke, regarding Fullilove's role in the planning and execution of the bank robbery.

      **C.**      **That One Government Witness Is Now Suspected of Bank Robbery Himself Does Not Entitle Fullilove to Acquittal or a New Trial.**

At trial, the Government presented the testimony of Matthew Mahoney, who was working at the Chase bank branch the day Nickolas Lee robbed it. Fullilove asserts that she should receive a new trial because of "newly discovered evidence," namely that Mahoney was arrested nearly eight

12

weeks after the trial on suspicion of robbing multiple banks. According to Fullilove, Mahoney has "critical credibility issues" that the jury should hear.

At trial, Mahoney testified to the following:

1. He was working at the Chase branch on November 24, 2006, the day it was robbed (Tr. 274);

2. Mahoney entered the A code to open vault at the direction of the robber after the robber entered the bank with a real gun, hopped the counter, and requested the A and B codes to open the vault (Tr. 275-79, 286);

3. He replaced Fullilove in her position at the bank, and that Fullilove would come to the bank for personal transactions or to see Caroline Rivera (Tr. 280-81, 297-98);

4. A play-by-play description of the surveillance tape, including pointing out that the robber had a gun (Tr. 282-92);

5. The amount of loss sustained by the bank, $109,000[1], and his training from Chase that bank employees should comply (Tr. 297.).

Fullilove's counsel did not cross examine Mahoney. (Tr. 300.)

A defendant is entitled to a new trial under Rule 33 if she shows that the new evidence "(1) was discovered after trial, (2) could not have been discovered sooner with due diligence, (3) was material in the sense that it bore directly on guilt or innocence and was not simply impeaching or cumulative, and (4) if presented at a new trial, would probably result in acquittal." *See United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007) (citing *United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003). As an initial matter, Mahoney was arrested on November 10, 2010, almost two months after Fullilove's conviction. (Mot. at 4.) Newspaper accounts, quoted by Fullilove, state that Mahoney was arrested by FBI agents as he lurked outside a bank that was previously robbed,

---

[1] Lee also testified that he netted "about" $109,000 from the robbery. (Tr. 406.)

wearing the similar clothes that were worn in other robberies that week. (*Id.*) The Government states it did not know that Mahoney was a suspected bank robber at the time of trial, and Fullilove does not claim the Government did not inform the defense about Mahoney's criminal activities in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In short, neither the Government nor Fullilove suggest that Mahoney was somehow involved in the robbery of the Chase branch, other than as a witness.

The Government correctly points out that Mahoney's testimony was cumulative of Meghan Holmes-Dorsey ("Holmes"), another Chase employee present during the robbery. Holmes took the stand right before Mahoney and testified:

1. She was working at the Chase branch on November 24, 2006, the day it was robbed. (Tr. 253.)

2. She entered the B code to open vault at the direction of the robber after the robber entered the bank, hopped the counter, requested the A and B codes to open the vault. (Tr. 258-60.)

3. The robber had a gun and threatened her with it. (Tr. 260-261.)

4. A play-by-play description of the surveillance tape, including pointing out that the robber had a gun. (Tr. 262-70.)

5. The robber's gun was real. (Tr. 271-72.)

Fullilove's counsel did not cross Holmes either. (Tr. 272.)

Mahoney's testimony was cumulative of Holmes' testimony and consistent with the surveillance video, which both witnesses narrated in detail. Any impeachment value that Fullilove would have based on Mahoney's arrest would not apply to Holmes. Consequently, it cannot be said that Mahoney's testimony, or without cross-examination of Mahoney on his arrest, the jury's verdict was prejudiced. *See Berry*, 92 F.3d at 600. Further, Mahoney's testimony did not directly implicate

Fullilove directly in the crime. Mahoney was not a co-conspirator, and he was not present at any of the meetings with Lee and Rivera that formed the crux of the Government's conspiracy and aiding and abetting case. His only testimony that even mentioned Fullilove was that he replaced her in her position at the bank, he knew who she was, and that she would come in on occasion for personal transactions or to talk to Rivera. Fullilove is not entitled to a new trial on these grounds.

      **D.**      **In His Closing Argument, the Prosecutor Did Not Allude to Fullilove's Decision Not to Testify.**

Fullilove asserts that the prosecutor made an improper remark regarding Fullilove's decision not to testify during his closing argument. The Court analyzes claims that a prosecutor has tainted a trial with improper remarks with a two-part inquiry. *See United States v. Harris*, 271 F.3d 690, 699 (7th Cir. 2001). The first step is to determine if the remarks were, in fact, improper. *Id.* (Citing *United State v. Cusimano*, 148 F.3d 824, 831 (7th Cir. 1998)). As for the specific remarks,

> any indirect commentary on the defendant's failure to testify, including references to 'uncontradicted' or 'uncontested' testimony, in order to be improper, must (1) consist of language and words that are 'manifestly intended' to be a comment on the defendant's decision not to take the stand, when analyzed in the context in which they are used, or (2) be of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence.

*Harris*, 271 F.3d at 699. If the remarks were improper, the Court "consider[s] whether they have impacted the fairness of the trial based upon the content of the entire trial record." *Id.* It is the defendant's burden to show this second prong; to carry it, the defendant "must show that it is at least likely that the misconduct complained of affected the outcome of the trial–i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty." *Id.* (quoting *United States v. Morgan*, 113 F.3d 85, 89 (7th Cir. 1997)).

At one point in his rebuttal closing argument, the prosecutor stated:

15

> Now yes, Lee said that he had the gun somewhere he didn't think it was visible. Okay. But who knows better than the defendant what the defendant saw with her own eyes? And her post-arrest statement was that she saw the gun. And could that have happened? Could he – while he was getting into the car with her or while he's walking could she have seen a glimpse of the .357 on him? Sure she [c]ould. And who would know better than the defendant whether or not Nickolas Lee had a gun on him?
>
> *And keep in mind when we're talking about incentives and incentives for how you're going to shape what your testimony is going to be, the person in the courtroom with the biggest stake in the outcome of this case is the defendant.* And when she was interviewed in her post-arrest statement, she said that she was 80 percent sure that there was talk about a gun . . . And I'm not using the number 80 percent in order to throw any type of quantification out there or anything. I'm saying that at that point in time she had incentives to minimize her culpability, to make it seem like she was less involved than she was. And despite that[,] she said she was 80 percent sure there was a gun.

(Tr. at 610; emphasis added). Specifically, Fullilove objects to the italicized sentence beginning with "[a]nd keep in mind," asserting it was improper because it commented on a witness' incentive to testify a certain way, "and then connecting it with the incentive of the defendant" and that it influenced the jury in a case built upon the testimony of Lee and Rivera as cooperating witnesses.

The prosecutor's remark, taken in context, was not improper. It is clear that the prosecutor made the remark during a discussion of Fullilove's post-arrest statement, and was not referring to the trial itself. Indeed, the prosecutor bookended the remark at issue with express references to the post-arrest statement. The prosecutor was pointing out that at the time she made those post-arrest statements to Agent Alcoke, she had every reason to minimize her culpability in, and knowledge of, the planning and execution of the robbery, but she still stated that she was 80 percent sure one of the planning meetings discussed a gun. In essence, the prosecutor was telling the jury they could trust Fullilove's own words because they were made against her self-interest. The jury would not take

16

the remark as a "natural and necessary" comment on Fullilove's decision to testify - it was related only to her decision to talk to Agent Alcoke after her arrest.

## IV. CONCLUSION.

For the foregoing reasons, Fullilove's motion for acquittal or new trial (Docs. 65 and 83) is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: **March 18, 2011**